633 A.2d 1119

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Tyrone MOORE, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 1992.

Decided Nov. 9, 1993.

Reargument Denied Feb. 23, 1994.

530

532

Joseph Matthias Cosgrove, Forty Fort, M. John Haley, Kingston, for appellant.

Peter Paul Olszewski, Jr., Dist. Atty., David E. Schwager, Wilkes Barre, Robert A. Graci, Chief Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

We have before us an automatic direct appeal [1] from the judgment of sentence of death imposed upon appellant, Tyrone Moore, by the Court of Common Pleas of Luzerne County, following his conviction of murder of the first degree.[2] We affirm the judgment of sentence of death.

1. See, 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b) and 1941.

2. Appellant's first trial ended in a mistrial because certain photographs utilized by a Commonwealth witness for purposes of initially identifying

A jury found appellant guilty of murder of the first degree,[3] criminal conspiracy,[4] two counts of robbery,[5] theft by unlawful taking or disposition,[6] and recklessly endangering another person.[7] A separate penalty hearing was held regarding the murder conviction. The jury found two aggravating circumstances,[8] and no mitigating circumstances, and fixed appellant's penalty at death. Appellant's post-trial motions, as well as an interlocutory appeal raising the issue of double jeopardy were subsequently denied.

Thereafter, appellant was formally sentenced to: death on the criminal homicide count;[9] ten to twenty years imprisonment on the criminal conspiracy count, consecutive to the sentence of death; and ten to twenty years imprisonment on the second robbery count, concurrent with the sentence for criminal conspiracy. The trial court suspended sentences on the first count of robbery and the count of recklessly endangering another person, and did not sentence on the charge of theft by unlawful taking or disposition because it merged with the second count of robbery.

As in all cases where the death penalty has been imposed this Court must conduct an independent review of the sufficiency of the evidence without regard to whether the appellant has challenged the conviction on that ground. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444,

appellant, but which were not introduced into evidence at trial, were inadvertently given to the jury at the time it commenced its deliberations.

**3.** 18 Pa.C.S. §§ 2501, 2502(a).

**4.** 18 Pa.C.S. § 903.

**5.** 18 Pa.C.S. § 3701.

**6.** 18 Pa.C.S. § 3921.

**7.** 18 Pa.C.S. § 2705.

**8.** The defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7).

**9.** 42 Pa.C.S. § 9711.

77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The test for establishing sufficiency is whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt. *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). The following facts established by the evidence produced by the Commonwealth clearly satisfy this test.

On October 1, 1982, at approximately 8:00 p.m., Nicholas Romanchick and his spouse, Karen Ann Marie Romanchick, arrived at the Forty–Fort Animal Hospital located in the Borough of Wyoming, Luzerne County, Pennsylvania. The Romanchicks were greeted by Dr. Joseph Lopotofsky, who directed them to an examination room and commenced an examination of their cat. Dr. Lopotofsky's examination was interrupted when appellant and Ricardo Scott entered the entrance area of the animal hospital claiming that they had hit a dog with their vehicle.[10] Dr. Lopotofsky directed them to bring the dog in, and returned to his examination of the Romanchicks' cat.

Appellant then entered the examination room holding a gun and ordered Dr. Lopotofsky and the Romanchicks to lie on the floor, while Scott, who was also brandishing a firearm, brought Dr. Lopotofsky's assistant, Barbara Nowakowski, to the examination room and forced her to the floor with the others. Scott then began tying up the victims with adhesive tape under the watchful eye of appellant. After Scott had completed taping Dr. Lopotofsky and while he was taping Ms. Nowakowski, Nicholas Romanchick was shot once in the back. Appellant and Scott immediately fled the animal hospital with Mrs. Romanchick's purse.

Shortly thereafter, appellant, Scott and a third man, Anthony Jones, arrived at the residence of Kenneth McGoy in Wilkes Barre, Pennsylvania, and upon departing, they left

---

**10.** The record reflects that appellant, Scott and Anthony Jones had travelled to the Forty–Fort Animal Hospital from Philadelphia in furtherance of a conspiracy to rob Dr. Lopotofsky.

behind numerous items from Mrs. Romanchick's purse. These items were subsequently disposed of in a storm drain by Mr. McGoy and later recovered by the authorities with the help of Mr. McGoy's girlfriend/roommate.

As a result of the gunshot wound to his back, Nicholas Romanchick suffered extreme trauma to his pulmonary artery and superior pulmonary vein, coma, and death thirteen days later, resulting from brain damage caused by lack of oxygen.

The Commonwealth presented the testimony of Dr. Lopotofsky, Ms. Nowakowski, Mrs. Romanchick, and Mr. Scott, who testified similarly concerning the manner in which the events had transpired that evening. While none of these witnesses actually saw appellant shoot Nicholas Romanchick, the jury could have reasonably inferred from their testimony that appellant shot Nicholas Romanchick, especially considering the testimony of Mr. Scott who stated that he had given his gun to appellant when he began taping Dr. Lopotofsky.

In defense, by way of alibi, appellant offered only his testimony concerning his activities in Philadelphia on October 1, 1982, together with the testimony of Mr. McGoy, who stated that appellant was not one of the three men who visited his residence on that night. However, the jury was free to disbelieve this evidence, given the positive in-court identification of appellant by Mrs. Romanchick, Scott and Mr. McGoy's girlfriend/roommate, together with the testimony of Robert Brunson who stated that he had seen appellant in the presence of Jones and McGoy on the night of October 1, 1982. *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989).

Based on this evidence, together with that provided by the testimony of the investigating police officers, treating physician, and medical examiner, we conclude that the Commonwealth presented sufficient evidence to sustain appellant's convictions.[11]

11. Appellant, through counsel, has asserted twenty-five claims of error, many containing numerous sub-challenges. We have thoroughly reviewed each challenge and have concluded that the following assertions are meritless and are denied without opinion: (1) The verdict slip used in the penalty phase of his trial violated the mandate of *Mills v.*

538

■ Appellant claims that the trial court erred in denying trial counsels' request to withdraw and appellant's *pro se* motion for removal of trial counsel, which were filed prior to the commencement of appellant's second trial.[12] Appellant alleges that "irreconcilable differences" existed between himself and his appointed counsel concerning the alibi defense and obtaining witnesses. Although appellant does not specifically enlighten us concerning these alleged irreconcilable differences, he relies upon *Commonwealth v. Tyler*, 468 Pa. 193, 360 A.2d 617 (1976), and *Commonwealth v. Nicolella*, 307 Pa.Super. 96, 452 A.2d 1055 (1982), which held it an abuse of

*Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), by requiring jury unanimity in the finding of one or more mitigating factors; (2) the sentencing verdict slip contains a finding of an invalid aggravating circumstance and fatally defective ambiguities as to the second of the two aggravating circumstances found; (3) the trial court erred in instructing the jury at the penalty phase that its verdict must be unanimous, which misled the jury concerning the language of 42 Pa.C.S. § 9711(c)(1)(iv), which makes provision for the occurrence of a non-unanimous verdict; (4) the trial court erred in permitting the introduction of trial testimony at the penalty phase without limiting this introduction solely to evidence relating to aggravating and mitigating circumstances; (5) the trial court erred in granting the Commonwealth's challenge of a potential juror for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh'g denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), and in permitting the Commonwealth to use peremptory challenges also in violation of *Witherspoon;* (6) the prosecutor improperly argued to the jurors in the penalty phase that their decision was not a moral one, and improperly used religious reference to support the death penalty during voir dire; (7) the jury selection system in Luzerne County unconstitutionally excludes Black–Americans and other minorities from the jury venire; (8) the death penalty is unconstitutional in that it violates the current standard of social decency; (9) the Commonwealth failed to disclose the contents of the taped FBI statement of Scott, and other information concerning him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as refined in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); (10) Appellant's constitutional rights not to be placed twice in jeopardy were violated by his proceeding twice to trial as a result of actions by the Commonwealth; (11) the verdict was against the weight and sufficiency of the evidence; (12) the trial court erred in denying appellate counsels' motion for the appointment of expert services for investigation of various issues.

12. There were two assistant public defenders representing appellant as a team. Appellant's motion sought removal of both attorneys.

discretion to deny a request for change of counsel where there was no evidence that the request was arbitrary or for the sole purpose of delaying trial, even if it was made on the morning of trial.

Whether a petition for change of court-appointed counsel should be granted is within the sound discretion of the trial court. *Commonwealth v. Williams,* 514 Pa. 62, 68, 522 A.2d 1058, 1061 (1987). Moreover, although the right to counsel is absolute, there is no absolute right to a particular counsel, *Commonwealth v. Johnson,* 428 Pa. 210, 236 A.2d 805 (1968), and appointed counsel shall not be removed except for substantial reasons. Pa.R.Crim.P. 316(c).

The trial court determined that whatever merit there may have been in the position of counsel in seeking removal, there was reason for it to believe that, by waiting until some two weeks before trial to present his *pro se* motion, appellant was simply trying to insure a delay in trial. Furthermore, the trial court, while mindful of the constitutional rights guaranteed to appellant, observed that counsel had provided skilled and dedicated representation throughout the prior trial and the proceedings leading up to the present trial. It determined that appellant's contention of ineffective representation by counsel totally lacked substance, and concluded that in view of the fact that present counsel had already tried this case from beginning to end, appellant's own interest could be best served by continued representation by such counsel in view of their extensive familiarity with all of the various issues presented at trial.

Given this, we conclude that under the particular circumstances of this case, the trial court did not abuse its discretion in refusing to remove appointed counsel. Appellant's reliance on *Nicolella* is misplaced as it involved a defendant that had not spoken with counsel since the preliminary hearing. His reliance on *Tyler,* while more appropriate, does not alter our conclusion, as it involved a defendant forced to trial without representation, and there was no evidence that his request for the appointment of counsel was arbitrarily made or made for

540

the sole purpose of delaying trial. Moreover, as appellant clearly received zealous representation throughout the proceedings, and has failed to allege facts to reasonably support this claim, we find no reasonable basis upon which to remand this matter for an evidentiary hearing.

Next, appellant claims that the trial court erred in denying his motion to suppress pre-trial photographic identification by Mrs. Romanchick, resulting in a fatal taint upon his trial.

We recognize that in response to this challenge, the Commonwealth bears the burden of establishing that any identification testimony to be offered at trial is free from taint of initial illegality. *Commonwealth v. Turner*, 454 Pa. 520, 314 A.2d 496 (1974); Pa.R.Crim.P. 323(h). In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In making this determination, the court should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of time between the incident and the court identification. *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17 (1976); *United States v. Higgins*, 458 F.2d 461 (3d Cir.1972).

Prior to the suppression hearing Mrs. Romanchick had properly selected the photos of appellant from a photo array and also identified him at the preliminary hearing. Nevertheless, while Mrs. Romanchick was once again able to specifically identify appellant as present at the suppression hearing, she also selected one photograph of appellant and a photograph of another man when appellant's counsel attempted to re-create the photo array.

In addition to appellant's claim that this occurrence alone required suppression, appellant also claims that the original photo array was suggestive, because out of the fifteen photographs showed to Mrs. Romanchick, two were of the defendant, two were of another man, and the remaining photographs were of an assortment of other men. He alleges further suggestiveness because of the nature of the mug shot and surveillance photograph, and because the police officer asked Mrs. Romanchick to select two photographs, one with glasses and one without. Appellant also challenges Mrs. Romanchick's ability to observe appellant during the crime as evidenced by her inability to state how many men were in the room, and discrepancies between her description of appellant and his actual appearance.

Mrs. Romanchick, a victim, was in a small well lit room, a few feet from appellant with her eyes trained on him as he held a gun on her for an extended period of time. Under such circumstances, she had an extraordinarily good opportunity to observe appellant. It is not significant that she was unable to remember just how many men there were in the room during the ordeal, or fix appellant's height or weight with a high degree of specificity. Nor are we persuaded that the methods employed in connection with the initial photo array were suggestive. No information is offered concerning the photographs of the other men, nor is it alleged that the police officer directed Mrs. Romanchick to select the photographs which she did in fact choose. Even if we were to conclude that the photographic identification was unreasonably suggestive, the other factors present in this case convince us that there was little chance of misidentification of appellant.

Based upon the record evidence supporting correct identification, we agree with the trial court that there was not a very substantial likelihood of irreparable misidentification by Mrs. Romanchick.

Appellant's next claim of error concerns his appearance before the jury in prison clothing and with swollen eyes, sutured lip and bandaged head, which resulted from

injuries suffered while he was incarcerated. Appellant claims that due to his appearance and the publicity associated therewith, the trial court should have granted trial counsels' motion for mistrial. He further argues that the trial court erred in giving a cautionary instruction, over defense objection, regarding his appearance and the publicity surrounding that appearance.

The record reflects that near the beginning of appellant's second trial he was injured during a riot at Luzerne County Prison. In response to media reports suggesting that appellant was involved in instigating the riot while attempting to escape, appellant moved for a mistrial. The trial court denied this motion and also denied appellant's request that the jury be polled regarding any prejudice that may have arisen from the media reports. In denying these motions, the trial court stated outside the presence of the jury that "if the information is correct the defendant was one of the prime agitators involved in the incident and the Court feels he should not profit by his conduct by extending any delay in this trial." (N.T. 415). However, since appellant was appearing in court with a bandage on his head, and because appellant had exhibited concern about the media reports, the trial court gave the following curative instruction, albeit over appellant's subsequent objection:

> Ladies and gentlemen of the jury, for the past three days, including today, you could not help but notice the fact that the defendant, Tyrone Moore, has had his head, in part, covered with a bandage. You may or you may not have heard or read about reports that Mr. Moore was allegedly involved in, and injured, in a fracas which allegedly occurred between some inmates of Luzerne County Prison, including Mr. Moore, and the guards there, as well as some state police and other security agencies.

> You are now cautioned that in your deliberations as to your verdicts in this case you are not to consider whatsoever anything which you may have heard or read or seen on television regarding that altercation as same pertains to the defendant, Mr. Moore. At the appropriate time your ver-

dicts shall be and only can be based on what you have heard and seen during the course of this trial as same pertains to the charges herein against the defendant, Mr. Moore.

Any outside matters beyond that cannot and must not be considered by you in arriving at your verdicts in this case. So you are cautioned to pay no attention to the fact that Mr. Moore's head is bandaged or to any reports involving any altercation which he may have been involved in the prison. That has nothing to do with this case.

Your verdicts, again, will be based solely on what is presented from the witness stand during the course of this trial.

(N.T. 416).

 As a general matter, a trial cannot be terminated every time a defendant appears with a bandage around his head, and when such an incident occurs, the trial court must take whatever action it deems appropriate under the circumstances. It is a matter within the sound discretion of the trial court to determine whether this cautionary instruction was necessary in light of the publicity surrounding the prison riot coupled with appellant's appearance at trial. *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987).

Appellant argues that the trial court was predisposed as to appellant's guilt, by inferring that he was a prime agitator in the prison incident. However, the statement by the trial court was specifically conditioned on "the reports being true," and was made outside the hearing of the jury. (N.T. p. 415). We find nothing in the record that would support the conclusion that the trial judge was predisposed or that appellant was prejudiced by this statement by the trial court.

However, appellant argues that the contents of the curative instruction together with his appearance at trial impermissibly "cloaked him as a prisoner" in violation of *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), *reh'g denied*, 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976).

In *Estelle*, the U.S. Supreme Court was presented with the potential effects of presenting an accused before a jury in

"prison attire." The Court found that the defendants appearance would be a *constant reminder* of the accused's condition that might have significant effect on the jury's feeling about the defendant, without serving any essential state policy.[13] While the court upheld the conviction in *Estelle* on the basis that the defendant was not "compelled" to appear in jail attire, it noted that it would be error for a trial court to compel a defendant against his will to stand trial in prison attire, while at the same time recognizing that in some instances such error may be harmless.

While we recognize that the curative instruction by the trial court in the matter *sub judice* together with appellant's appearance at trial had the effect of informing the jury that appellant was a prisoner and may have been injured while incarcerated, we do not conclude that this factor rises to the level of error proscribed in *Estelle*. There is nothing in the record to indicate that appellant was compelled to wear prison attire, nor that the jury was aware that appellant was clothed in prison attire. Furthermore, appellant fails to establish that the clothing was marked or identified as prison attire.[14]

 Moreover, even if we were convinced that appellant had been improperly cloaked as a prisoner by the trial court's curative instruction combined with his appearance at trial, we conclude that such error would be harmless. In *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978), this Court determined that "an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." *Id.* at 406, 383 A.2d at 162. Error is considered harmless where: (1) the error did not prejudice the

---

**13.** It is clear that the U.S. Supreme Court recognized in *Estelle* that there will be situations where such factors cannot always be avoided, such as where increased security through the use of shackles or additional security personnel are required based upon the nature of a defendant.

**14.** See *Reilly v. Southeastern Pennsylvania Transportation Authority*, 507 Pa. 204, 489 A.2d 1291 (1985), wherein this court expressly stated that "in resolving those issues properly before us, we may only look to the record prepared in the trial court." *Id.* at 215, 489 A.2d at 1296. This Court then went on to note that the practice of alleging in a brief facts upon which a trial court has not passed is improper. *Id.*

defendant or the prejudice was de minimis; or (2) the errone-ously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and "the uncontradicted evidence of guilt must be so over-whelming, and the prejudicial effect of the improperly admit-ted evidence so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Id.* at 410–15, 383 A.2d at 164–66. See *Commonwealth v. Foy,* 531 Pa. 322, 612 A.2d 1349 (1992).

Therefore, while we conclude that the trial court did not err in denying appellant's motion for a mistrial, in providing the cautionary instruction, or in permitting appellant to appear before the jury in certain clothing and with his injuries, even if the trial court erred when it informed the jury that appellant was a prisoner and may have been injured while incarcerated, such error was harmless beyond a reasonable doubt. In addition, given the nature of appellant's claims, the evidence of record, and the manner in which we have disposed of these claims, we find that appellant has advanced no reasonable basis upon which to remand this matter for an evidentiary hearing in connection with these claims.

### Penalty Phase Error

Appellant claims that the trial court erred in instructing the jury at the penalty phase regarding the weighing of aggrava-ting and mitigating circumstances, and the burden placed upon appellant in this regard.

Specifically, appellant alleges numerous problems with the following excerpt from the instructions of the trial court:

For purposes of this case, the defendant has the burden to present *testimony,* if he wishes, as to any mitigating circumstances to be considered by you in the possible *reduction of sentence* in this matter. He may, if he wishes, present any mitigating matter concerning the character or the record of himself, the defendant, or the circumstances of

his defense. *If the mitigating circumstances outweigh or equal the aggravating circumstances, your verdict must be a sentence of life imprisonment, otherwise it must be a sentence of death.*

(N.T. 728) (emphasis added).

Appellant claims that the reference to reduction of sentence told the jury to "presuppose" a sentence of death which may be reduced by mitigating circumstances. He also claims the trial court limited the evidence the jury could consider in mitigation because it stated he had the burden to present "testimony." Appellant finds this important because evidence other than testimonial evidence may be introduced, and because he presented no testimonial evidence during the penalty phase of his trial. While appellant's claims are creative, he cites no authority for his propositions, and we conclude that they do not warrant reversal.

As a general matter, the charge of the trial court must be read in its entirety. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 954 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). While the particular portion of the charge to which appellant objects does not approach the concept of when the death penalty is mandated from the same perspective as 42 Pa.C.S. § 9711, it cannot be concluded that it misrepresents the law or misleads the jury. Furthermore, the subsequent instructions of the trial court, which include a review of the language of the verdict slip, clearly mirror the statutory language and requirements of 42 Pa.C.S. § 9711(c)(1)(iv). Based upon the trial court's clear explanation to the jury of its obligations under Section 9711, we cannot conclude that the jury presupposed a sentence of death.[15]

---

**15.** We note with little deference appellant's claim that this instruction resembles the instruction in *Zettlemoyer*, which this Court found to be erroneous as given, but cured by subsequent instruction. The question in that case concerned the problem that might arise where the jury weighs aggravating circumstances and mitigating circumstances *equally*, and has not been instructed that in such an instance they must impose life imprisonment. This situation is clearly not before us.

█ Nor can we conclude that the trial court erred when it stated that appellant had a duty to produce testimony rather than general evidence of mitigation. There is simply no evidence that the jury's consideration of appellant's evidence in mitigation was foreclosed by the trial court's statement, especially considering appellant's use of the available mitigating evidence during closing argument. The trial court permitted appellant to incorporate all the evidence presented during the guilt phase of the trial, and immediately after making the allegedly objectionable statement, the trial court stated that appellant may present any mitigating matter concerning the character or the record of himself, or the circumstances of his defense. Moreover, later in its instructions, the trial court stated that "it is entirely up to the defendant whether to testify or to present evidence [in mitigation during the penalty phase of the trial]. . . ." (N.T. 731). We simply cannot attribute the jury's finding of no mitigating circumstances to the trial court's isolated reference to "testimony," where appellant offered no new mitigating evidence during the penalty phase of his trial, and appellant made zealous use of the available evidence in mitigation during closing argument.

█ Next, appellant claims that the trial court erred in failing to instruct the jury at the penalty phase regarding the role of appellant in the crimes alleged, and that trial counsel were ineffective in failing to request such an instruction, in accord with *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

*Tison* held that major participation in a felony, combined with at least reckless indifference to human life, is sufficient to impose the death penalty. Appellant argues that despite his conviction of robbery, there was no proof that the killing was in the perpetration of the felony, because there was evidence that the robbery was an afterthought. Thus, he claims that the trial court erred in not instructing the jury that pursuant to *Tison* the death penalty may be imposed only if it is proven that the defendant was a major participant in the felony and that his actions included a reckless indifference to human life.

In *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991), this Court specifically addressed this claim, and held that a "Tison charge" is not helpful where a defendant has already been found guilty of first degree murder, since in so doing, the jury has already satisfied the minimum culpability requirement of *Tison.* As the jury in the case *sub judice* had already found appellant guilty of first degree murder and robbery when it undertook consideration of penalty, a *Tison* charge was not relevant or warranted. Appellant's argument is not even premised on facts similar to those in *Tison,* which was a second degree murder case, focusing on the various levels of accomplice culpability. Moreover, by posturing his argument in this manner, appellant is asking this Court to hold the trial judge and trial counsel to a standard which was several years from being enunciated at the time of the instant trial. Accordingly, appellant's claim provides no basis for a finding of trial court error, and as such, cannot provide the basis for a finding that trial counsel were ineffective. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

Appellant next advances three arguments that the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711, is unconstitutional on its face, and as applied in this case.

■ (1) **Appellant argues that 42 Pa.C.S. § 9711 violates the Equal Protection and Due Process clauses of the Federal Constitution, and Article I, Sections 1, 9 and 15, and Article V, Section 10 of the Pennsylvania Constitution.**

Specifically, appellant argues that under 42 Pa.C.S. § 9711 he received a verdict of sentence without the benefit of a pre-sentencing report prepared by the appropriate officer of probation and parole, where he would receive such upon conviction of any other crime pursuant to 42 Pa.C.S. § 9731. He claims that this could have provided some sort of mitigating evidence that may have helped him avoid imposition of a sentence of death. While we agree with appellant's assertion that all prosecutions should receive application of uniform procedures, we cannot agree with appellant that the opportu-

nity afforded him during the separate penalty phase of his trial deprived him of that which he would have received through a pre-sentencing report. We are convinced that due to the serious nature of death penalty proceedings, a defendant is afforded the greatest possible opportunity to present available considerations to the sentencing body. Accordingly, and because appellant has not specified the nature of the considerations that he was allegedly denied, we conclude that 42 Pa.C.S. § 9711 is not unconstitutional for the reasons advanced by appellant.

**(2) Appellant next argues that 42 Pa.C.S. § 9711 is unconstitutional because it violates the separation of powers requirement of the Pennsylvania Constitution.**

Specifically, appellant argues that through enactment of 42 Pa.C.S. § 9711 the Legislature is intruding upon the affairs of the Judiciary, which under Article 5, Section 1 et seq. of the Pennsylvania Constitution has sole responsibility of all judicial functions. Appellant, without citation to authority, essentially argues that it is an insult to the Judiciary to have its most awesome responsibility of imposing sentence given to the jury, thus, basically rendering the judge a mere clerk to the jury. Unquestionably, we disagree.

"It is the province of the Legislature to determine the punishment imposable for criminal conduct," *Commonwealth v. Wright,* 508 Pa. 25, 39, 494 A.2d 354, 361 (1985), *aff'd sub nom., McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). We perceive no difference between the mandatory nature of the death penalty and other mandatory sentencing, which is constitutional with respect to the doctrine of separation of powers and procedural due process. *Id.;* See also *Commonwealth v. Nenninger,* 359 Pa.Super. 444, 519 A.2d 433 (1986). Accordingly, it cannot be concluded that the Legislature has unconstitutionally usurped the Judiciary's function of imposing sentence by providing that the jury render a mandatory sentencing verdict, based upon its findings as to the existence of aggravating and mitigating circum-

stances pursuant to the strict controls governing the penalty provided by 42 Pa.C.S. § 9711.

■ (3) Appellant next argues that 42 Pa.C.S. § 9711 is unconstitutional because it requires creation of a special criminal tribunal in violation of Article I, Section 15 of the Pennsylvania Constitution.

Article I, Section 15 provides "No commission shall issue creating special temporary criminal tribunals to try particular individuals or particular classes of cases." Appellant concludes that based upon this prohibition, the penalty phase of a capital trial is unconstitutional because the jury is a forbidden temporary criminal tribunal, which sits in judgment on only particular individuals in a particular class of case. This claim is meritless.

The present wording of Article I, Section 15 was adopted May 16, 1967, and replaced the 1874 section of the Constitution, which provided that "no commission of oyer and terminer or jail delivery shall be issued." This earlier text was similarly intended "to secure to the Commonwealth, as well as to the accused, a trial by the ordinary tribunals to the exclusion of special tribunals created for the trial of particular cases, with a view to produce a particular result." *Commonwealth v. Green*, 58 Pa. 226, 232 (1868). However, "it has no application to a court erected by law with a general criminal jurisdiction." *Id.* Thus, it has no applicability to the ordinary general criminal jurisdiction of the Court of Common Pleas of Pennsylvania. It is this court which tried appellant, not, as he alleges, a special tribunal comprised of the jury.

Appellant next argues that the death verdict in this case is disproportionate to cases of a similar nature in Pennsylvania generally, and in Luzerne County specifically, requiring reversal or an evidentiary hearing on the issue of the Commonwealth's abuse of discretion in seeking the death penalty in this case.

Appellant contends that the trial court should conduct proportionality review at the county level in order to potentially prevent this Court from having to conduct such a review.

However, he fails to indicate how he is prejudiced by this Court conducting the proportionality review, which is mandated by 42 Pa.C.S. § 9711 on direct appeal, and which we conclude is by its nature a statewide question.

Appellant also argues that the district attorney abused his discretion in seeking the death penalty because he did not conduct a review of the potential mitigating factors in this case. Thus, appellant seeks a hearing so that the reasoning of the district attorney concerning this decision may be of record. On the facts of this case it is impossible to perceive any logical argument by which the District Attorney could be guilty of abusing his discretion in presenting the question of penalty to the jury in accordance with the death penalty statute. 42 Pa.C.S. § 9711.

■ Finally, appellant focuses on the fact that he is black and the victim was white, and discusses a Congressional General Accounting Office survey allegedly discovering racial disparities in the imposition of the death penalty. Citing the "abundance of errors going against him" appellant then concludes that he should not have had to face the death penalty. As we conclude herein that appellant was not subjected to an abundance of errors in his trial, and we recognize that the jury in this case found two aggravating circumstances and no mitigating circumstances, 42 Pa.C.S. § 9711(c)(1)(iv) requires a verdict of death. Therefore, all similarly situated defendants receive the same sentence, and thus, the death penalty cannot be considered excessive or disproportionate to the penalty imposed in cases involving these circumstances. Accordingly, appellant's claims of disproportionality of sentence must be denied, and remand for an evidentiary hearing on this claim is unwarranted.

### Ineffectiveness of Counsel

■ Appellant next raises three claims of pre-trial, trial and penalty phase ineffectiveness of trial counsel. In order for appellant to prevail on a claim of ineffectiveness he must demonstrate that: (1) the underlying claim is of arguable

merit; (2) the particular course chosen by counsel did not have some reasonable basis designed to effectuate his interests; and (3) counsel's ineffectiveness prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Furthermore, counsel can never be found ineffective for having elected not to raise a meritless claim. *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981); *Commonwealth v. Giknis*, 491 Pa. 215, 420 A.2d 419 (1980).

**(1) Ineffectiveness in failing to use Scott's prior statement for purposes of impeachment and mitigation.**

Appellant argues that trial counsel failed to obtain a copy of the tape recorded statement of his accomplice and Commonwealth witness Ricardo Scott, which allegedly contained conflicts with Scott's trial testimony, and indicated that Scott was in a "reefer haze" during the incident. Appellant claims that the inconsistencies and evidence of Scott's mental state would have provided significant impeachment of Scott's testimony, would have raised a reasonable doubt as to appellant's guilt (at least the degree of guilt), and could have provided mitigating evidence for the penalty phase of the proceedings.

This is a very complicated argument by counsel. We have reviewed it, and conclude, as did the trial court, that it is meritless. The well reasoned opinion of the trial court, sitting *en banc* provides:

At Defendant's second trial, the only testimony tending to specifically identify Defendant as the individual who fired the shot that killed Nicholas Romanchick came from Ricardo Scott. Testimony of the Luzerne County Coroner was to the effect that the victim had been shot once in the back, with the bullet entering between the eighth and ninth ribs just to the right of the midline of the victim's body and traveling upward toward the right front lateral aspect of his body so as to emerge from the body and pass through the victim's right arm. The Commonwealth held to this position from the beginning of the trial. Scott, however, at some time prior to Defendant's arrest, gave a statement to an Agent of the Federal Bureau of Investigation in Philadel-

phia, with the prosecutor, Pennsylvania State Police Officer Donald Taylor, present at the time the statement was given. There is attached to present counsel's Argument Brief what purports to be a transcript of the taped statement of Ricardo Scott. This transcript indicates that Scott told the FBI Agent that he was blindfolding Dr. Lopotofsky and binding Mrs. Nowakowski just prior to the firing of the fatal shot. As originally typewritten, the transcript then reads as follows:

> I was stooped down in the corner, so when I looked up he (obviously referring to Nicholas Romanchick) had jumped up and was trying to wrestle Tyrone Moore ... and Tyrone Moore shot the gun.

For some reason which is totally unexplained, the typewritten transcript has been partially deleted and longhand insertions have been made, apparently by two different writers using different pens, so that the transcript, as revised in longhand, reads as follows:

> There was a big guy there in the corner (obviously referring to Nicholas Romanchick), so when I looked up, he had jumped up and was trying to rush Tyrone Moore ... and Tyrone Moore shot the gun.

Further in the transcript Ricardo Scott is quoted as having said the following:

> Mr. Moore had both guns in his hands. I was taping the woman.... I was informed that the guy had supposedly been shot through the back, but he wasn't. He was shot through the front because there wasn't nobody in back of him, not unless it was a ghost.

Defendant's present counsel contend that there is a serious conflict between the statement made by Scott to the FBI Agent and the testimony which Scott later gave at Defendant's trial, and that prior counsel had ineffectively represented Defendant by failing to obtain a copy of the taped statement of Scott so as to use it at trial to impeach Scott's credibility. In addition, they contend that the fact that Scott had previously asserted that Nicholas Romanchick had either rushed at or wrestled with Defendant

immediately prior to the shooting clearly mitigates the alleged action of the Defendant, making a premeditated killing an impossibility and raising the distinct possibility that the jury, had it known of the prior statement, may have found Defendant guilty of second or third degree murder or even manslaughter. In addition, Defendant's present counsel contend that the fact that Scott made a statement to the FBI Agent that he was in a "reefer haze" during the period just prior to his entry into Dr. Lopotofsky's office would tend to affect or reduce his credibility as a witness, and that this prior statement could therefore have been used for the purpose of impeachment.

We find the arguments of Defendant's present counsel in reference to prior counsels' possible use of the statement given by Scott to the FBI Agent to be highly ingenious but not sufficiently persuasive to incline us to grant a new trial. For one thing, we have only the bare assertion that trial counsel were unaware of the content of the statement made by Scott to the FBI Agent. We find nothing in the record which substantiates this assertion, and it is the contention of the Commonwealth, with which we agree, that a fair reading of the cross-examination of Scott tends to indicate that Defendant's trial counsel were aware of the contents of the prior statement.

If trial counsel had elected to use a portion of the prior statement for the purpose of impeachment, the Commonwealth would have had the right to have the portion used placed in context, and the context would have tended largely to reiterate the statements made by Scott at trial, thus bolstering his credibility.

Wholly apart from the dangers inherent in the use of the prior statement for the purpose of impeachment, we must seriously question the contention of Defendant's present counsel that there is an inherent conflict between Scott's prior statement and his testimony at trial. On both occasions Scott asserted that he was involved in binding Mrs. Nowakowski just prior to the shooting and that at that point in time he was not watching either Defendant or Nicholas

Romanchick. The typewritten transcript of the prior statement is to the effect that Romanchick had jumped up and was trying to wrestle Defendant just before he was shot, and we have no explanation whatever as to why the word "rush" was substituted for the word "wrestle" in the typewritten transcript. Even a most cursory examination of the transcript tends strongly to suggest that this revision was made by some person other than the person who had made the original longhand revisions of the preceding portions of the transcript and that it was in all probability made at another point in time. There is nothing to indicate that Scott did anything more than glance at Romanchick in the instant just prior to the shot being fired; and it is therefore apparent that, despite his statement to the FBI Agent that Romanchick was shot "through the front", it is entirely possible that Romanchick was shot through the back as he was attempting to wrestle with Defendant. It is clear from Scott's prior statement that he was of the opinion that Romanchick was shot through the front simply "because there wasn't nobody in back of him", whereas it is entirely possible that Romanchick was shot in the back while attempting to wrestle with Defendant, even if Defendant was at that time in front of Romanchick. When men wrestle they tend to throw their arms around one another, and such a posture clearly could place one or both of Defendant's hands behind Romanchick even if Romanchick were facing Defendant at the time.

In the final analysis, we are of the opinion that the emphasis placed by Defendant's present counsel on the need for perfect clarity as to the manner in which the fatal wound is inflicted tends to remind one of Don Quixote tilting at a windmill. The defense offered by this Defendant at trial was not that it was Scott rather than he who had fired the fatal shot. The defense was that he had been mistakenly identified as one of the parties present at Dr. Lopotofsky's office on the night of the fatal shooting, and there is nothing to suggest that any of the alleged inconsistencies in the statements made by Scott prior to and at trial would have in

any way bolstered such a defense. A Defendant who asserts that there has been ineffective assistance of counsel at trial must prove not only that counsel made an error in judgment, but also that that error prejudiced the outcome of the case. *Commonwealth v. Durah–El,* 344 Pa.Super. 511, 496 A.2d 1222 (1985). The burden of proving ineffectiveness of trial counsel rests upon Defendant, since counsel's stewardship at trial is presumptively effective. *Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). One cannot judge the effectiveness of trial counsel in hindsight. Such a judgment must be based on the circumstances at trial, and must be looked at from the perspective of trial counsel. *Commonwealth v. Garrity,* 509 Pa. 46, 500 A.2d 1106 (1985). We find nothing in this record sufficient to convince us that the failure of trial counsel to use Scott's prior statement for purposes of impeachment, whether to point out alleged inconsistencies as to the manner in which the shooting occurred or whether to impugn Scott's accuracy on the ground that he was in a "reefer haze", constituted ineffective representation in light of the circumstances then and there existing. In addition, we simply refuse to accept the validity of the proposition that a man who enters another man's office or dwelling, armed with a revolver, and with the intent to commit armed robbery, and who then shoots and kills at point blank range a man who attempts to prevent the commission of the robbery, can be heard to seek a reduction of the magnitude of his offense from first degree murder to second or third degree murder or manslaughter on the theory that he lacked a specific intent to kill. A jury could just as readily infer that he had from the very inception of the plan a specific intent to kill anyone who attempted to stand in his way and prevent the commission of the robbery.

Tr.Ct.Op. pp. 4–8.

Given the analysis of the trial court on this issue, and our independent review of the record, which reveals nothing sufficient to convince us that the failure of trial counsel to specifically use Scott's prior statement for purposes of impeachment

constitutes ineffective representation, this claim must fail. Moreover, given the circumstances then and there existing and the nature of appellant's present claim, we find it unnecessary to grant appellant's request that we remand this matter for a hearing on whether trial counsel actually obtained a copy of Scott's taped statement or were sufficiently aware of the contents thereof.

Aside from the dangers associated with the use of the statement, and the evidence that counsel were aware of the contents of the statement (trial counsel presented a discovery request for the statement), the inconsistencies are minor and are not so inherently contradictory as to negate the thrust of Scott's testimony that appellant had pulled the trigger. Throughout the trial appellant contended that he was not present at the scene, and it was not Scott alone who placed appellant there while Scott taped those unfortunate enough to be present in the animal hospital on that night. Even if we remanded for the requested hearing and it was determined that counsel were unaware of the contents of the tape, which we believe to be very unlikely based upon the record, appellant simply cannot assert the requisite prejudice therefrom. We find it difficult to envision how such evidence could have substantiated appellant's alibi defense, or sufficiently supported a finding of reduced intent, or mitigated appellant's involvement in this homicide.

### (2) Ineffectiveness during the penalty phase.

This argument is a conglomeration of unsupported claims flowing from the allegedly bad environment surrounding the attempted "divorce" between appellant and his counsel after the first trial. These claims relate to counsels' failure to: secure a character/alibi witness (Willie Rush) who was appellant's boxing trainer; object to the prosecutor's remarks concerning future appeals and the potential for reversal arising from trial error; present mitigating evidence; request a sympathy charge; and disagree with the prosecutor's statement that a prior murder conviction is an aggravating circumstance.

We have thoroughly reviewed these allegations under the ineffectiveness standard discussed above, and conclude that the trial court properly determined that trial counsel were not ineffective during the penalty phase for any of these reasons. Once again, much of appellant's argument improperly refers to information outside the record. To the extent that appellant finds support in the record for his arguments, such support is clearly insufficient to support a finding of ineffectiveness. Rather, the record clearly reveals that appellant received zealous and competent representation throughout these proceedings under the circumstances.

The real thrust of appellant's claim is that all of these incidents taken together rendered counsels' representation during the penalty phase ineffective. Presumably, counsel would likely be found ineffective in an instance where they failed to obtain evidence in mitigation reasonably available or failed to conduct a reasonable investigation. In such an instance, it would be readily apparent that counsel were just going through the motions during the penalty phase, especially where no evidence in mitigation is presented. However, such is not the case here.

Obviously, just as there are cases where evidence in mitigation exists, there are those instances where no evidence in mitigation exists or is obtainable by reasonable means. Thus, the mere fact that appellant's trial counsel presented no specific evidence in mitigation does not render their performance ineffective. Once again, the record reveals that defense counsel made substantial efforts on appellant's behalf in this case, and they cannot be faulted for the lack of available mitigating evidence given the circumstances present, which included the failure of any member of appellant's own family to appear after being served with subpoenas. Trial counsel made zealous argument in mitigation of appellant's crime during the penalty phase given the limited evidence in mitigation, and appellant fails to advise this Court what mitigating evidence could have been offered.

Under these circumstances, we find no need to grant appellant's request that we remand this matter for an evidentiary hearing on these ineffectiveness claims. Appellant's unsupported claims possess no arguable merit, appellant cannot establish the requisite prejudice arising therefrom, and appellant has failed to provide evidence that would give rise to a reasonable basis supporting remand for an evidentiary hearing.

### (3) Ineffectiveness during pre-trial and the trial.

Once again, appellant assembles a hodgepodge of unsupported claims which relate to counsels' failure to: secure unnamed witnesses; request transcription of the preliminary hearing; secure statements of unnamed witnesses; investigate the alibi defense; consult with appellant regarding his defense; allow the jury to return a verdict in the first trial because of a motion for mistrial; seek change of venue; investigate the background of Scott; and conduct adequate voir dire.

Based upon all of this, which appellant argues is "so beyond the norms of effective counsel," appellant claims that he is entitled to a new trial or new penalty hearing or an evidentiary hearing. To the extent that appellant's contentions find any support in the record, we have thoroughly reviewed them under the ineffectiveness standard discussed above, and conclude that trial counsel were not ineffective during the pretrial or trial of this case for any of the reasons alleged. Once again, the record reveals that defense counsel made substantial efforts on appellant's behalf in this case, and they cannot be faulted for reasonable trial strategy given the circumstances present, which included strong identification evidence, substantial evidence of numerous aggravating circumstances and extremely limited evidence in mitigation.

Moreover, the cursory nature of these claims, and the conclusory nature of appellant's argument serve only to strengthen our determination, and that of the trial court, that these claims possess no arguable merit and cannot support a finding of the requisite prejudice. Once again, we find no

reason to grant appellant's request for an evidentiary hearing on these claims, where appellant's unsupported claims possess no arguable merit, appellant cannot establish the requisite prejudice arising therefrom, and appellant has failed to provide evidence that would give rise to a reasonable basis supporting remand for an evidentiary hearing.[16]

## Post-trial Error

 Next, appellant argues that he is entitled to a new trial on the basis of after-discovered evidence. Specifically, appellant relies upon statements contained in a deposition of Anthony Jones conducted by appellate counsel on November 15, 1985, which essentially provide: that Scott did not mention that appellant was involved in the murder; that appellant was not present in Wyoming Valley; that as far as Jones knew appellant was not involved in the murder; and that a third man, Emmet Burgis, was involved in the murder. Appellant maintains that this evidence is very reliable, as it is a statement against penal interest, since Jones inculpates himself in a robbery.

After-discovered evidence is a proper basis for a new trial only if:

> (1) it has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Valderrama,* 479 Pa. 500, 505, 388 A.2d 1042, 1045 (1978).

16. We note that appellant's fifteenth claim, as directed towards ineffectiveness of trial counsel, fails to include his additional claims of ineffectiveness associated with several of the claims of trial error discussed elsewhere in this opinion. For purposes of clarification, as we determine those claims of trial error to be meritless, counsel cannot be deemed ineffective.

Appellant's claim does not satisfy this standard, as the testimony of Jones is for the sole purpose of impeaching the testimony of those connecting appellant with this murder; it was available at or prior to the conclusion of the trial; and it is not of such nature and character that a different verdict will likely result if a new trial is granted.

In addition to the testimony of Jones, appellant claims that the potential testimony of Willie Rush also warrants a new trial. However, appellant offers no indication as to how Mr. Rush would testify, only that Mr. Rush had indicated off the record that he would testify on appellant's behalf. Furthermore, based upon inquiry of the trial court, the record indicates that Mr. Rush was served with a subpoena to testify in this case, that he told the district attorney that he believed that he could not be of any help, and that he could not be located at the time of trial. (N.T. 513). This is further supported by a conversation, noted on the record, between an F.B.I. agent and Mr. Rush wherein Mr. Rush allegedly stated that he knew appellant generally, not very well, and that he did not know, and there could be no way for him to know, whether appellant was at a gym in Philadelphia on October 1, 1982. (N.T. 514).

Appellant also cites to "impeachment evidence," which trial counsel allegedly failed to obtain concerning memory lapses of Scott. However, appellant fails to further enlighten this Court concerning this alleged evidence. Accordingly, neither this unspecified evidence, nor that of Mr. Rush or that attributed to Mr. Jones warrants a new trial.

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we have the duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the

circumstances of the crime and the character and record of the defendant.

Upon such review, we find that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. We also find that the evidence supports the jury's finding of the aggravating circumstance specified in 42 Pa.C.S. § 9711(d)(6) (The defendant committed a killing while in the perpetration of a felony), and the aggravating circumstance specified in 42 Pa.C.S. § 9711(d)(7) (In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense). The conspiracy designed to rob Dr. Lopotofsky culminated in the murder of Nicholas Romanchick and the forceful and violent theft of Mrs. Romanchick's purse, and the projectile appellant discharged from his firearm travelled in close proximity to, and could have easily harmed Mrs. Romanchick, Dr. Lopotofsky, and/or Barbara Nowakowski.

In addition, and as discussed *supra*, we find no excess or disproportionality of the sentence of death when compared to the sentences imposed in similar cases. We emphasize that the statute requires a verdict of death in those instances where the jury finds at least one aggravating circumstance and no mitigating circumstances, 42 Pa.C.S. § 9711(c)(1)(iv). Therefore, all similarly situated defendants receive the same sentence, and thus, the death penalty cannot be considered excessive or disproportionate to the penalty imposed in cases involving these circumstances. Furthermore, upon consideration of the circumstances under which appellant committed this homicide, together with his character and record, we find no basis upon which to conclude that his sentence is excessive or disproportionate to the penalty imposed in similar cases.

Accordingly, we affirm the judgment of sentence of death.[17] Judgments of sentence affirmed.

LARSEN, J., did not participate in the consideration or decision of this case.

17. The Prothonotary of the Supreme Court is directed to transmit the complete record of the case *sub judice* to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).