684 A.2d 1025

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Miguel RIOS, Appellant.**

Supreme Court of Pennsylvania.

Argued May 1, 1996.

Decided Oct. 30, 1996.

274

Earl G. Kauffman, Philadelphia, for M. Rios.

Catherine Marshall, Alan Sacks, Philadelphia, for Commonwealth.

Robert A. Graci, Harrisburg, for Office of Attorney General.

Before FLAHERTY, ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

On June 17, 1993, following a seven day trial in the Court of Common Pleas of Philadelphia County (trial court), a jury found Miguel Rios (Appellant) guilty of first degree murder[1] for the shooting death of Jose Ortiz. The jury also convicted Appellant of three counts each of robbery[2] and unlawful restraint,[3] two counts of aggravated assault,[4] and one count

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 2902.

each of burglary,[5] criminal conspiracy[6] and possession of an instrument of crime[7]. The jury found three aggravating circumstances and one or more mitigating circumstances.[8] Finding that the aggravating circumstances outweighed the mitigating circumstances, the jury set the penalty at death.

New counsel was appointed to pursue Appellant's post-verdict remedies. After a hearing, the trial court denied Appellant's post-verdict motions and imposed the jury's sentence of death. The trial court also imposed consecutive prison sentences of ten to twenty years for each count of robbery, ten to twenty years for burglary, five to ten years for criminal conspiracy, two and one-half to five years for each count of unlawful restraint and two and one-half to five years for possession of an instrument of crime.[9]

This case is now before us on direct appeal pursuant to 42 Pa.C.S. § 9711(h)(1). For the reasons discussed below, we affirm the judgment of sentence imposed by the trial court.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant challenges the sufficiency of the evidence supporting his convictions for first degree murder and criminal conspiracy. Even without these specific challenges, we are required to conduct an independent review of the sufficiency of the evidence in cases where the death penalty has been imposed. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3,

4. 18 Pa.C.S. § 2702.

5. 18 Pa.C.S. § 3502.

6. 18 Pa.C.S. § 903.

7. 18 Pa.C.S. § 907(a).

8. The jury found the following aggravating circumstances: Appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); Appellant, in the commission of the offense, knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7); and Appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9).

9. Appellant's convictions for aggravated assault merged with his convictions for robbery for sentencing purposes. *See Commonwealth v. Nelson*, 337 Pa.Super. 292, 486 A.2d 1340 (1984).

454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). When reviewing a sufficiency of the evidence claim, an appellate court must view all of the evidence, and the reasonable inferences to be drawn from that evidence, in the light most favorable to the Commonwealth as verdict winner and must determine if the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d 11, 13 (1992).

Pursuant to this standard, the evidence at trial established that on August 27, 1992, Irma Colon (Irma) was sleeping on a couch in the living room of a row home at 330 West Wellens Street in Philadelphia. Irma's sister, Carmen Colon (Carmen), the father of Carmen's child, Jose Ortiz (Jose) and Carmen's two-year-old son, Jose Ortiz, Jr. (Carmen's son) were in a locked bedroom on the second floor. At approximately 9:00 a.m., Appellant, wearing a Philadelphia Gas Works uniform, rang the doorbell. Irma awoke and went to the window, where she saw Appellant standing outside the house. She opened the front door, exited the house and opened a security gate that surrounded the house. Appellant identified himself as a meter man and Irma admitted him to the house and locked the security gate behind her.

Once inside the house, Appellant grabbed Irma by the neck, pulled out a "walkie-talkie" and announced that "everything is under control." Appellant then forced Irma onto the couch, pulled her hair and threatened to kill her if she did not give him the keys to the security gate. Irma relinquished the keys. Appellant pointed a silver-colored handgun at Irma, took her to the front door and tossed the keys to a second man who was waiting outside the gate. As the second man entered the house, Irma noticed a third man walking toward the house. At that point, Appellant twisted Irma's arm behind her back and demanded to know who else was in the house. Initially, Irma said she was alone. When Appellant again threatened to kill her, Irma told him that Jose, Carmen and Carmen's son were upstairs.

Appellant forced Irma to accompany him to the second floor bedroom door where he announced "police" in an attempt to get the occupants to open the door. When Carmen requested time to get dressed, Appellant threatened to kill Irma if the door was not opened immediately. Realizing that Appellant was not a police officer, Jose attempted to retrieve his nine-millimeter Glock handgun from a bedroom closet. However, the closet door became stuck. Fearing for Irma's life, Jose opened the bedroom door.

Appellant, Irma and a second man entered the bedroom and Appellant ordered Irma to lie face-down on the floor. Appellant, who was carrying the silver-colored handgun, forced Jose to kneel in front of the bed while Carmen lay on the bed with her son. Appellant then demanded money, gold and drugs and threatened to kill Jose if he did not produce these items. Jose denied having any money but told Appellant that there was gold and a handgun in the bedroom closet. Appellant directed the other men to bind Jose's hands and feet and he ordered Carmen to stop looking at him. Although Carmen covered her face with her hands, she looked between her fingers several times and observed Appellant and two other men in the bedroom. After Jose's hands and feet were bound, Carmen noticed that one of the other men had Jose's nine-millimeter Glock handgun stuck in his pants.

Appellant and the other men then began searching the house. When the search failed to yield anything of significant value, Appellant and the other men returned to the bedroom and beat Jose and Irma. During the beatings, one of the men removed jewelry from Irma's body. Irma lost consciousness a few moments later. Carmen, who was lying on the bed holding her son with her eyes closed, felt the presence of one of the men standing over her and then heard a gunshot. After the gunshot, Carmen remained on the bed with her eyes closed until she felt someone crawl onto the bed next to her a short time later. She opened her eyes to find Irma on the bed, Jose lying motionless on the floor and Appellant and the other men absent from the room. Carmen and her son climbed out of the bedroom window. As Irma prepared to

follow them, she heard one of the intruders returning to the second floor. Irma managed to crawl out of the window before he reached the bedroom and she followed Carmen and her son to a neighbor's house.

Early that same morning, Hamlett Garcia, a worker at a nearby tire store, observed a Hispanic male wearing a blue uniform walk by with another man. A short time later, he saw an old station wagon, carrying at least two men, speed away from the area. When the police arrived at the scene, Appellant and the two other men were gone. An autopsy revealed that Jose died of a single bullet fired into his head. The autopsy also disclosed that Jose had been beaten on the head, shoulders and feet.

Carmen and Irma each separately identified Appellant from a photographic array shown to them by police. The police obtained an arrest warrant for Appellant on October 2, 1992. On October 4, 1992, the police found Appellant hiding in the closet of a home in Lancaster and arrested him. The police were unable to recover the murder weapon, but they did recover a "walkie-talkie" from the home where they found Appellant.

## A. *First Degree Murder*

To sustain a conviction for first degree murder, the Commonwealth must prove that a defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was deliberate. 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Butler*, 446 Pa. 374, 378, 288 A.2d 800, 802 (1972).

Appellant contends that the Commonwealth's evidence was insufficient to prove that he killed the victim because neither eyewitness actually saw him fire the fatal shot. Irma was unconscious and Carmen had her eyes closed when the gun was fired. Thus, Appellant claims the Commonwealth failed

to present sufficient evidence to prove that he shot Jose. We disagree.

We have found evidence sufficient to sustain a conviction for first degree murder where the witness did not see the defendant shoot the victim. *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119 (1993), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *see also Commonwealth v. Thompson*, 538 Pa. 297, 648 A.2d 315 (1994); *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Commonwealth v. White*, 442 Pa. 461, 275 A.2d 75 (1971). In *Moore*, the defendant and his accomplice, both brandishing guns, forced the victim and three witnesses to the floor of a veterinarian's office. The accomplice handed his gun to the defendant and was tying up one of the witnesses when the victim was shot in the back. Although neither the accomplice nor any of the witnesses saw the defendant shoot the victim, we found that a jury reasonably could have inferred that the defendant shot the victim. *Moore*, 534 Pa. at 537, 633 A.2d at 1124.

Here, the Commonwealth established that Appellant entered the room wielding a silver-colored handgun. He forced the victim onto the bedroom floor, threatened to kill the victim and ordered his confederates to bind the victim's hands and feet. Appellant then severely beat the victim while he lay helpless on the floor. Carmen testified that she saw Appellant in the bedroom shortly before she heard the gunshot that killed the victim. Although Carmen stated that one of Appellant's accomplices was carrying the victim's nine-millimeter Glock handgun in his pants, the Commonwealth's firearms expert testified that the markings on the bullet recovered from the victim's body indicated that it could not have been fired from a Glock. Therefore, the jury reasonably could conclude that Appellant fired the fatal shot from the silver-colored handgun he had been carrying. *Moore; Thompson; Griffin; White.* Accordingly, the evidence was sufficient to support Appellant's conviction for first degree murder.

### B. *Conspiracy to Commit First Degree Murder*

To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy. 18 Pa.C.S. § 903; *Commonwealth v. Brachbill,* 363 Pa.Super. 615, 626–27, 527 A.2d 113, 119 (1987), *rev'd on other grounds,* 520 Pa. 533, 555 A.2d 82 (1989). A defendant may be convicted of both conspiracy and the offense that was the object of the conspiracy. *Commonwealth v. Miller,* 469 Pa. 24, 364 A.2d 886 (1976).

Here, Appellant asserts the evidence was insufficient to prove that he shared the requisite intent to kill with the actual killer. This argument is based on the faulty premise that the Commonwealth failed to establish that Appellant fired the fatal shot. As discussed above, the Commonwealth adequately proved that Appellant shot Jose. Additionally, the evidence also established that Appellant directed the entire criminal episode from its inception. The evidence was sufficient to support Appellant's conviction for criminal conspiracy.

## II. *INEFFECTIVE ASSISTANCE OF COUNSEL*

We now turn to Appellant's allegations concerning his trial counsel's ineffectiveness. To raise a successful ineffective assistance claim, an appellant must demonstrate that: (1) the underlying claim is of arguable merit, (2) counsel's action or inaction was not grounded on any reasonable basis designed to effectuate his client's interests, and (3) counsel's ineffectiveness prejudiced appellant. *Commonwealth v. Pierce,* 515 Pa. 153, 158, 527 A.2d 973, 975 (1987). Trial counsel is presumed to have rendered effective assistance and an appellant has the burden to prove otherwise. *Commonwealth v. Marshall,* 534 Pa. 488, 496, 633 A.2d 1100, 1104 (1993).

## A. *Jury Charge on Accomplice and Co-conspirator Liability*

Appellant argues that trial counsel was ineffective for failing to object to the trial court's charge on accomplice and co-conspirator liability. Specifically, Appellant claims the trial court failed to articulate that an accomplice or co-conspirator can only be guilty of murder in the first degree if he possessed the specific intent to kill. Our review of the record indicates that the trial court's charge was proper.

When reviewing an allegedly erroneous jury instruction, the guiding principle is that the charge must be read in its entirety. *Thompson,* 538 Pa. at 307, 648 A.2d at 320. Here, the trial court thoroughly explained the concept of specific intent to kill. The trial court also explained that an accomplice or co-conspirator can be liable if he shares the intent to commit the crime at issue, i.e., first degree murder. Consequently, there is no merit in Appellant's underlying claim of trial court error because the trial court's charge was proper. Counsel cannot be deemed ineffective for failing to object to a proper jury charge. *Id.* at 309, 648 A.2d at 321.

## B. *Jury Charge on Aggravating Circumstances*

Appellant asserts that trial counsel was ineffective during the penalty phase because he did not object to two portions of the trial court's charge on the aggravating circumstance of creating a grave risk of death to another person in addition to the victim. 42 Pa.C.S. § 9711(d)(7). We find no merit in either of these claims.

First, Appellant claims the trial court's charge did not convey to the jury that the grave risk of death to another had to ensue from the specific act of killing. Specifically, Appellant challenges the following portion of the trial court's charge:

> Secondly, it was in the commission of the offense and the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense. That's something you have to decide. At the time that the defen-

dant shot the victim [Jose], there was a grave risk of death to anyone else. That is something you have to decide.

Notes of Testimony, June 17, 1992 at 786. Appellant asserts that the trial court's charge was overly broad because it allowed the jury to find the aggravating circumstance if it concluded that he was a participant in any part of the incident rather than the actual killing. We disagree.

The trial court instructed the jury to decide if there was a grave risk of death to anyone else "[a]t the time that the defendant shot the victim. . . ." Therefore, the charge adequately instructed the jury that the creation of a grave risk of death to another had to occur during the commission of the offense. Because we find no merit in Appellant's underlying claim of trial court error, trial counsel cannot be deemed ineffective for failing to raise a meritless claim. *Moore*, 534 Pa. at 552, 633 A.2d at 1131.

Second, Appellant claims that trial counsel should have objected to the trial court's use of the phrase "at the time that the defendant shot the victim" because the trial court removed any uncertainty about the identity of the person who shot the victim by telling the jury that Appellant shot the victim. We disagree. The trial court gave this instruction during the penalty phase, *after* the jury had found Appellant guilty of first degree murder. At this point, the jury had already heard sufficient evidence to establish that Appellant shot Jose. *See* Section I.A., *supra.* Thus, the trial court merely stated what the jury had most likely already concluded: Appellant fired the fatal shot. Appellant's underlying claim is without merit, and his allegation of ineffectiveness must fail.[10]

10. In the unlikely event that the jury found Appellant guilty of first degree murder as an accomplice, then the trial court's charge describing Appellant as the person who shot the victim would have been in error. However, this error, if it occurred, would have been harmless. An accomplice, like a principal, can be liable for creating a grave risk of death. *See, e.g., Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491 (1995). Therefore, although the trial court *may* have erred in presuming that the jury found Appellant liable as the principal, at this point in the trial the jury was focused on whether a grave risk of death was

## C. *Failure to Request Colloquy*

Appellant next claims that trial counsel was ineffective for failing to request the trial court to conduct a colloquy of the jurors after some of them had allegedly seen Appellant in handcuffs outside the courtroom. Appellant asserts this incident could have affected the jurors' ability to remain fair and impartial and trial counsel should have requested the trial court to determine the impact of this event on each juror. We disagree.

The record indicates that during a recess in trial, counsel informed the trial court that Appellant told him that six or seven jurors had seen him walking in the hallway with the sheriff as he returned from the men's room wearing handcuffs. Trial counsel moved for a mistrial or, alternatively, for a curative instruction. The trial court denied the motion for a mistrial but agreed to give a curative instruction in its charge to the jury. The trial court explained that it wanted to wait to give the curative instruction because a contemporaneous instruction would do more harm than good by highlighting the incident for the jury. The trial court later instructed the jury that although the defendant had been arrested and was in custody, these facts could not be used as evidence of guilt.

Under these circumstances, Appellant has failed to demonstrate that trial counsel was ineffective for acquiescing to the trial court's course of action. Initially, Appellant's underlying claim that some of the jurors viewed him briefly in handcuffs lacks support in the record. The only evidence of this episode is Appellant's uncorroborated statement to trial counsel that some of the jurors saw him in the hallway wearing handcuffs. Moreover, even if this brief viewing did occur,

> [i]t is well settled law that a mere accidental observation of a defendant in handcuffs outside a courtroom by a juror does not, without more, require the granting of a mistrial,

created, not who created the risk. Thus, if there was error here, it did not prejudice Appellant.

although a cautionary instruction by the trial court on the event will be appropriate.

*Commonwealth v. Evans,* 465 Pa. 12, 15–16, 348 A.2d 92, 94 (1975) (*quoting Commonwealth v. McGonigle,* 228 Pa.Super. 345, 352, 323 A.2d 733, 736 (1974)). Furthermore, counsel's decision not to request a colloquy of each juror was reasonable considering the trial court's offer to give a curative instruction in its charge and considering that a colloquy would likely emphasize the incident. Appellant's claim of ineffectiveness is without merit.

## III. *PROSECUTORIAL MISCONDUCT*

Appellant raises numerous claims of misconduct by the prosecutor, all of which allegedly occurred in the prosecutor's closing argument to the jury. It is well established that a prosecutor is free to argue that the evidence leads to guilt and is permitted to suggest all favorable and reasonable inferences that arise from the evidence. *Commonwealth v. Sam,* 535 Pa. 350, 362, 635 A.2d 603, 608 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). A prosecutor also may argue his case with logical force and vigor. *Commonwealth v. D'Amato,* 514 Pa. 471, 489, 526 A.2d 300, 309 (1987). Additionally, a trial court's decision not to grant a new trial based on prosecutorial misconduct will not be reversed on appeal absent an abuse of discretion. *Id.* at 491, 526 A.2d at 310. With these standards in mind, we now examine each of Appellant's claims.

### A. *Reference to Perpetrators Looking for Drugs*

Appellant contends the prosecutor improperly referred to facts not in evidence when he stated in his closing argument that the perpetrators were looking for drugs. The record plainly refutes Appellant's claim. Irma testified that after Appellant and the two other men forced her to the bedroom floor, they demanded money, drugs and gold. The prosecutor's comments were proper and Appellant's claim is entirely without merit.

## B. *Reference to Methods of Stealing Cars*

During his closing argument, the prosecutor referred to the testimony of a police officer who had stated that he found a car in Philadelphia registered to Appellant's girlfriend. The police used the car's registration to locate Appellant at his girlfriend's address in Lancaster. The police officer testified that the car was severely burned, but the ignition was intact. In his closing argument, the prosecutor indicated that these facts suggested the car had not been stolen before it was burned because cars can be stolen by removing the ignition. Defense counsel objected to the reference to methods of stealing cars and the trial court told the prosecutor to "stick to the evidence and the record and what inferences are to be drawn from the evidence." N.T., June 15, 1993 at 610.

Appellant now contends that the prosecutor's comment warranted a mistrial. It did not. The trial court promptly sustained Appellant's objection and told the prosecutor to "stick to the evidence." We are satisfied that the trial court's ruling adequately cured any prejudice that could have resulted from the prosecutor's comments, which concerned matters wholly tangential to the question of Appellant's guilt for the crimes charged.

## C. *Reference to Appellant Leaving the Scene*

Next, Appellant claims the prosecutor referred to evidence not of record when he stated that a witness, Hamlett Garcia, saw Appellant leave the victim's house in a speeding car. A review of the record shows that the prosecutor stated only that the witness saw the speeding car leave the scene. The prosecutor then suggested that Appellant was in that car. Since the witness previously testified that he saw a man in a blue uniform near the scene, it was reasonable for the prosecutor to suggest an inference that Appellant was in the car. *Sam.* We find no merit in Appellant's claim.

## D. *Personal Reference to Appellant*

Appellant asserts the prosecutor improperly described the Appellant to the jury as a "cunning criminal."

The record indicates that the prosecutor did not use those words, but characterized Appellant as "a very intelligent man." N.T., June 15, 1993 at 604. The prosecutor made this statement in reference to Appellant's elaborate scheme for gaining access to the victim's home by posing as a Philadelphia Gas Works employee. Immediately after the statement, trial counsel requested a mistrial, which the trial court denied. We find no error in this ruling.

As previously discussed, a prosecutor may argue all reasonable inferences that find support in the evidence. *Sam.* Here, the evidence demonstrated Appellant concocted a clever ruse to disguise the criminal purpose of his visit to the victim's home. Appellant has also failed to explain how being labeled "a very intelligent man" prejudiced him. Appellant's claim, therefore, is without merit.

### E. *Accusation of Appellant Intimidating a Witness*

Next, Appellant alleges the prosecutor accused him of intimidating a witness. The prosecutor never made such an accusation and Appellant's attempt to embellish the record is unconvincing. While discussing the credibility of Irma and Carmen, the prosecutor stated that they would have to return to their neighborhood after testifying. The inference the prosecutor was drawing from this fact was that Irma and Carmen would have no motivation to lie. Trial counsel objected to the prosecutor's comment, but the trial court overruled the objection. Under these facts, the prosecutor's inference was reasonable and the trial court properly overruled the objection. *See Commonwealth v. Brown,* 332 Pa.Super. 35, 46, 480 A.2d 1171, 1177 (1984) (reasonable for prosecutor to suggest that witness had no motive to lie because he lived in same neighborhood as defendant).

### F. *Prosecutor's Opinion of Witness's Truthfulness*

Appellant claims the prosecutor gave his personal opinion that Carmen had told the truth. Generally, it is improper for counsel to express his opinion regarding the credibility of a witness. *Commonwealth v. Gwaltney,* 497 Pa.

505, 513, 442 A.2d 236, 240 (1982). However, a prosecutor's remark regarding the credibility of a witness for the Commonwealth does not constitute reversible error if it is a reasonable response to a prior attack on the credibility of that witness by the defense. *Id.; see also Commonwealth v. Barren,* 501 Pa. 493, 498, 462 A.2d 233, 235 (1983).

■ Here, trial counsel, in his closing argument, challenged Carmen's credibility concerning her identification of Appellant as one of the perpetrators of the murder. In response, the prosecutor commented on Carmen's identification testimony as follows: "[t]hat's a mark of the truth. She is not trying to make stuff up to make the case better. She is telling the truth of what she knows." N.T., June 15, 1993 at 616. We believe the prosecutor's comments were a reasonable response, in both scope and force, to trial counsel's attack on Carmen's credibility. Indeed, we found a similar response to be reasonable under comparable circumstances. *Gwaltney,* 497 Pa. at 513, 442 A.2d at 240 (prosecutor's statement's regarding a witness that "he told the truth", "he did testify forthrightly", "[he] had to tell the truth" and "he was telling you what he honestly saw and what he honestly remembers" were proper responses to defense counsel's attack on credibility of witness). Accordingly, we find no merit in Appellant's claim.

### G. *Misstatement of Law on Vicarious Liability*

■ Appellant claims the prosecutor misstated the law concerning vicarious liability in his closing argument. As an example of vicarious liability, the prosecutor explained to the jury that the driver of a "get away" car used in a robbery can be liable for a crime committed by a co-conspirator during the course of that robbery. Other than a blanket claim of impropriety, Appellant provides no explanation concerning why the prosecutor's example was erroneous. There is no prohibition against a prosecutor discussing applicable law in his closing argument, as long as he states the law clearly and accurately. *Commonwealth v. Hardcastle,* 519 Pa. 236, 255, 546 A.2d 1101, 1110 (1988), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1169, 107

L.Ed.2d 1072 (1990). Moreover, the prosecutor's hypothetical example of vicarious liability was grounded in precedent. *See, e.g., Commonwealth v. Brown,* 351 Pa.Super. 119, 505 A.2d 295 (1986) (driver of "get away" car liable for co-conspirator's offenses). Accordingly, we reject Appellant's claim.

### H. *Failure to Object to Prosecutor's Remarks*

■ Appellant next argues that trial counsel was ineffective for failing to object to several of the prosecutor's above-mentioned remarks. As previously discussed, none of the prosecutor's remarks were improper. Trial counsel cannot be deemed ineffective for failing to raise meritless objections to those remarks. *Thompson,* 538 Pa. at 314, 648 A.2d at 323–24.

## IV. *FLIGHT CHARGE*

Appellant claims the trial court erred in charging the jury that it could consider Appellant's flight after the killing as evidence of Appellant's consciousness of guilt. Appellant maintains there was no evidence from which the jury reasonably could conclude that Appellant fled Philadelphia to avoid being captured by police. We disagree.

■ "When a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred." *Commonwealth v. Coyle,* 415 Pa. 379, 393, 203 A.2d 782, 789 (1964). It is permissible to infer that a defendant knows he is wanted for a crime from the circumstances attendant to his flight. *Commonwealth v. Whack,* 482 Pa. 137, 393 A.2d 417 (1978); *Commonwealth v. Tinsley,* 465 Pa. 329, 350 A.2d 791 (1976). For example, in *Tinsley,* there was no direct evidence that the defendant knew police were searching for him in connection with a murder. Instead, the Commonwealth presented evidence that the defendant abandoned his normal pattern of living without explanation. Efforts to locate the defendant at his home, his place of

employment and at his brother's home were unsuccessful. Additionally, the police had issued a bulletin on the night of the murder advising that the defendant was wanted regarding the murder. This Court found that these circumstances allowed for a permissible inference that the defendant knew the police were searching for him and purposefully attempted to avoid capture. *Tinsley,* 465 Pa. at 333, 350 A.2d at 793.

Here, the evidence established that Appellant fled from the crime scene and police were unable to locate him at his home. The police also contacted Appellant's brother without success. The distribution of defendant's photograph to officers in other precincts also proved futile. It was not until five weeks after the murder that police found Appellant hiding in a closet at his girlfriend's home in Lancaster. Because of these circumstances, the trial court had a sufficient basis to charge the jury that it could infer guilt from Appellant's flight.

## V. UNDERREPRESENTATION OF HISPANICS IN JURY SELECTION SYSTEM

Finally, Appellant claims he was deprived of a fair trial because the jury selection system in Philadelphia County systematically yields juries that underrepresent Hispanic–Americans. To support this contention, Appellant attaches to his brief a copy of a motion purportedly submitted to the trial court that challenges the array of prospective jurors for his trial. Appended to the motion are the results of an investigation performed by the Defender Association of Philadelphia that allegedly provide statistical support for Appellant's claim of underrepresentation. Appellant's claim, however, is not properly before this Court.

Initially, we note that a challenge to a jury array is governed by Pa.R.Crim.P. 1104, which provides in relevant part as follows:

### RULE 1104. LISTS OF TRIAL JURORS

### AND CHALLENGE TO THE ARRAY

\* \* \* \* \* \*

(b) Unless opportunity did not exist prior thereto, a challenge to the array shall be made not later than five days before the first day of the week the case is listed for trial of criminal cases for which the jurors have been summoned and not thereafter, and shall be in writing, specifying the facts constituting the ground for the challenge.

* * * * * *

The trial court docket, however, contains no reference to Appellant's motion. The motion itself is not dated and does not bear a time-stamp from the clerk of courts. Although the Defender Association completed its investigation more than six months before Appellant's trial, there is nothing to indicate that Appellant ever submitted his motion containing the results of the investigation to the trial court. Moreover, Appellant provides no explanation for these omissions.

 It is well settled that "[a]n appellate court may consider only the facts which have been duly certified in the record on appeal." Pa.R.A.P.1921 note, *citing Commonwealth v. Young,* 456 Pa. 102, 115, 317 A.2d 258, 264 (1974). Matters outside the record cannot be considered. *Commonwealth v. Bracalielly,* 540 Pa. 460, 475, 658 A.2d 755, 763 (1995). This prohibition applies equally to capital cases.[11] *Commonwealth v. Crawley,* 541 Pa. 408, 417 n. 9, 663 A.2d 676, 681 n. 9 (1995); *Commonwealth v. Baker,* 531 Pa. 541, 559, 614 A.2d 663, 672 (1992). Thus, because they are not part of the certified record, we cannot consider Appellant's motion or the results of

11. The prohibition against considering evidence outside the record announced in *Young* and embodied in the note to Pa.R.A.P.1921 is separate and distinct from the prohibition against considering issues not raised in the lower court found in Pa.R.A.P. 302(a). On occasion, we have relaxed Rule 302(a) and addressed issues raised for the first time on direct appeal in capital cases because of the final and irrevocable nature of the death penalty. *See Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982). This review is made possible where the alleged error can be addressed by an examination of matters in the record. However, in cases like the present, where an Appellant bases his claim entirely on facts not in evidence, we remain steadfast in our refusal to consider matters outside the record.

the Defender Association's investigation appended to the motion.[12]

## VI. *REVIEW OF DEATH SENTENCE*

Having rejected all of Appellant's claims for relief, we are required to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).

▮▮ First, our review of the record indicates that the sentence was not the product of passion, prejudice or any other arbitrary factor. To the contrary, the Commonwealth presented sufficient evidence to establish that Appellant killed Jose Ortiz.

12. Even if we were to consider the evidence submitted by Appellant, his claim would still fail. The motion and accompanying investigation results are so statistically flawed as to prevent meaningful review. Although the investigation has numerous deficiencies, the two most glaring flaws are noteworthy.

First, there is no indication that the Defender Association randomly selected the thirty jury arrays it identified in the investigation. Thus, we cannot discern if the data is representative of the actual jury selection system or if it has been purposefully culled to provide a stronger basis for a claim of underrepresentation.

Second, Appellant's claim of underrepresentation rests on the Defender Association's determination that there were insufficient numbers of prospective jurors of Hispanic origin on the jury arrays it sampled. However, the Defender Association's method of ascertaining the number of prospective jurors of Hispanic origin is patently unreliable in a majority of the arrays it sampled. The Defender Association simply counted the number of prospective jurors that, in its subjective determination, had Hispanic-sounding surnames. This Court can hardly be expected to invalidate the entire Philadelphia County jury selection system based on such conjectural data.

Second, the evidence was sufficient to support each of the three aggravating circumstances found by the jury. There was ample evidence to demonstrate that the killing occurred during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that Appellant has a significant history of felony convictions, 42 Pa.C.S. § 9711(d)(9). Moreover, Appellant does not challenge the evidence supporting these aggravating circumstances.

Appellant does challenge the sufficiency of the evidence supporting the jury's finding that he knowingly created a grave risk of death to another person in addition to the victim.[13] Appellant contends there was no grave risk of death here because Irma, Carmen and her baby were not close enough to the victim when the shot was fired for any of them to have been endangered. We disagree.

It is not necessary that the endangered bystander be directly in the line of fire for a grave risk of death to occur. The potential for an "errant, ricochet or 'pass-through' bullet" can create the requisite risk. *Commonwealth v. Smith,* 518 Pa. 15, 45, 540 A.2d 246, 260 (1988). In *Commonwealth v. Watson,* 523 Pa. 51, 565 A.2d 132 (1989), we found that the defendant knowingly created a grave risk of death to another when he fired into a closet where he knew a child was hiding, although the child escaped injury. Similarly, in *Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865 (1986), we found that the defendant knowingly created a grave risk of death to others when he shot the victim in the head at close range during a party, although no one else was injured.

Here, Appellant fired the fatal bullet at the victim while the victim lay on the floor of an enclosed bedroom. Irma was on the floor close to the victim and Carmen and her

---

**13.** 42 Pa.C.S. § 9711(d)(7) states:

(d) Aggravating circumstances—aggravating circumstances shall be limited to the following:

\* \* \* \* \* \*

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

son were on a bed nearby. These circumstances demonstrate that an errant bullet could have struck and killed Irma, Carmen or her son. The risk of death was not reduced because Appellant fired only a single bullet. *Commonwealth v. Ly*, 528 Pa. 523, 541, 599 A.2d 613, 622 (1991). We find there was sufficient evidence to support the jury's finding that Appellant created a grave risk of death to another person.

 Third, this Court has performed an independent review of the cases involving the sentence of death to determine if Appellant's sentence of death was proportional to the sentences imposed in similar cases. After reviewing the sentencing data compiled by the Administrative Office of Pennsylvania Courts, we find that the sentence of death here is not excessive or disproportionate.

Accordingly, we affirm the verdict and sentence of death.[14]

NIX, Former C.J., did not participate in the consideration or decision in this case.

**14.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).