J-S47003-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NYJEAH JEROME WHITE | : | |
| | : | |
| Appellant | : | No. 1382 EDA 2023 |

Appeal from the Judgment of Sentence Entered April 19, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0002381-2021

BEFORE: STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.: **FILED APRIL 1, 2024**

Appellant, Nyjeah Jerome White, appeals from his judgment of sentence of life imprisonment for first-degree murder and related offenses. Appellant contends, *inter alia*, that the court erred by denying his motion for a new trial based on a text message sent after the guilty verdict from Appellant's former girlfriend claiming that another person committed the murder. We conclude that the trial court acted within its discretion by denying Appellant's motion for a new trial, and accordingly, affirm.

The trial court accurately summarized the evidence adduced during Appellant's non-jury trial as follows:

> On December 31, 2020, Officer Joshua Samuels, a Norristown police officer, responded to the 1200 block of Markley Street for a shooting. In an alleyway next to the house at 1238 Markley Street, he found the body [of] Rasheed Bundy with a gunshot wound to the head. The officer described the alleyway as dark

---

[*] Former Justice specially assigned to the Superior Court.

[and] pitch black. After clearing the alleyway of onlookers, he started asking questions but most of them were uncooperative and did not provide information.

Another Norristown police officer responded to the shooting scene around 9:42 p.m. At trial, he described that the alleyway was between the residence at 1238 Markley Street and that of 1240 Markley Street.

Lee Burke, the victim's younger brother, was spending time with his family at 1236 Markley Street on the night of the murder. The victim was also there at the residence. Mr. Burke received a call from Appellant [asking for] the victim to come outside to talk with him. [The victim] agreed but did not go out right away. Mr. Burke knew Appellant, a/k/a "Ny", because Mr. Burke's and the victim's sister, Latrae Bundy, had been in a relationship with Appellant for about two years. Mr. Burke described his relationship with Appellant as cordial. Appellant called Mr. Burke a second time asking where the victim was and ask[ing] for the victim to come outside to talk. Mr. Burke and the victim went outside, walked towards the alleyway by 1240 Markley Street. Mr. Burke testified that only Appellant was in the alleyway when they approached. The victim walked into the alleyway and Mr. Burke stood on the sidewalk, facing Markley Street, about three feet away. He figured they were just going to talk, but there was no conversation and within less than 30 seconds, Mr. Burke heard gunshots. After checking his own body, he turned around and saw the victim laying on the ground, bloody. Mr. Burke was "freaking out" and yelling that he was going to kill Appellant. Appellant walked right past Mr. Burke towards his vehicle, got in his vehicle, made a U-turn, stopped by the scene for a moment, said something unintelligible to Mr. Burke, and then drove off.

Detective Michael Crescitelli of the Montgomery County Detective Bureau—Homicide Unit, obtained surveillance video from the area. Specifically, one of the surveillance videos showed the Roosevelt School at 1161 Markley Street, about a block from the murder scene, just down the street. At 8:59 p.m. on December 31, 2020, Appellant's vehicle was captured parking in front of the school. Two people exited the vehicle. The front passenger was seen removing a large object from the backseat. Appellant and the second person walk in the direction of 1236 Markley Street, the video show[ed] a vehicle pull up, which was later determined to be the pizza delivery driver, Br[y]an Davis, immediately after the

- 2 -

shooting, the video showed an individual run from the area of 1240 Markley Street, cross the street to his vehicle. Appellant got into the driver's side, made a U-turn, stopped, and then drove off.

Dr. Khalil Wardak performed the autopsy on the victim [on] January 1, 2021. He determined that the cause of death was from multiple gunshot wounds. The gunshot to the neck had evidence of stippling from the gun powder residue. This indicated that the victim was within 3 feet of the firearm. This gunshot [wound] alone would have been fatal. Dr. Wardak also testified that he found two gunshot wounds to the victim's head. This would have been immediately incapacitating. The doctor reviewed the records of a projectile recovered from Appellant. It had been recovered from the soft tissue area rear of his neck. It had not penetrated any bone. The shape of the bullet specimen was deformed with a flat surface, partially concave, it was smooth, and there was no jacket that ordinarily covers the bullet core. Dr. Wardak opined that the based on these observations of the deformations, the bullet ricocheted from a surface before striking Appellant.

Bryan Davis, Jr., was delivering pizza and on the night of the murder, he was called to make a delivery to 1240 Markley Street. When he arrived[,] no one answered the phone from that location. He had already returned to the pizza store when someone from 1240 Markley Street called him and asked him to return with the order. When he returned, two guys were waiting for him on the sidewalk to pick up their order. Because they could not carry the entire order in one trip, Mr. Davis waited for them to come back to get the rest. He waited for them behind his car, behind a black pillar, right by 1241 Markley Street. That was the closest he was to the alleyway between 1238 and 1240 Markley Street. From this vantage point, he testified that he saw four people in the alleyway. Because the alleyway was "not really lit," he could only see figures and not faces. He heard about two or three gunshots go off. Afterwards he saw someone run out of the alleyway, past him, and to a vehicle across the street. Mr. Davis took two steps closer to the alleyway and heard someone yelling, "Ny, shot my brother." That person came out of the alleyway and repeatedly said, "Ny shot my brother."

After the Commonwealth presented the remaining witnesses and rested, defense counsel, in part called Latrae Bundy, the victim's sister, to testify. Ms. Bundy characterized her relationship with Appellant at the time of the murder as friends; but they had

- 3 -

previously been in a four-year relationship and was his fiancé at one point. Before the shooting, Ms. Bundy spoke to Appellant for about an hour-and-a-half but had no knowledge that Appellant was going to talk to her brother in the alleyway. Ms. Bundy was inside the residence at 1236 Markley Street at the time of the murder. She also spoke to Appellant after the murder and found out he was injured, and she met up with him a few days afterwards. They stayed in constant contact .

* * * *

The Commonwealth presented the testimony of Johon Ford, who at the time of trial was incarcerated in Chester County with several pending charges. He signed a proffer agreement in May of 2022, and in that agreement, Mr. Ford acknowledged that he was not promised anything for his testimony, and that the Commonwealth would only let his sentencing judge know the extent and nature of his cooperation. Mr. Ford testified that he grew up with the victim and had been friends with him and his family. He also knew Appellant, from being around the victim's family. About a month after the murder, Mr. Ford met up with Appellant in the Germantown section of Philadelphia and they talked about the murder. During that conversation, Appellant told him that he killed the victim. Appellant didn't tell him any other details of what happened.

Mr. Ford knew about Appellant's relationship with Ms. Bundy; he knew it was rocky and that Ms. Bundy moved on from him. Appellant told him that he "was certain he was getting played," meaning Ms. Bundy had another boyfriend while still having a relationship with him. Appellant was hurt. Appellant believed that Ms. Bundy's brothers knew about it, but they did not tell him what was going on. Mr. Ford spoke to Appellant about three or four times after the murder, prior to Appellant's arrest. This Court, as fact-finder, found Mr. Ford's testimony to be credible.

Pa.R.A.P. 1925 Opinion, 8/3/23, at 2-6, 16-17 (cleaned up; record citations omitted).

The court summarized the relevant procedural history of this case as follows:

- 4 -

At the conclusion of the trial, [the trial court] found Appellant guilty of first-degree murder, persons not to possess [firearms], and possessing an instrument of crime.

Following his guilty conviction, but prior to sentencing, defense counsel filed a Motion for Extraordinary Relief, alleging after-discovered/recantation testimony in the nature of a text message sent by Ms. Bundy to counsel on August 24, 2022. It was alleged in Ms. Bundy's text that the fourth person in the alleyway [w]as Rashid Wallop and that he was the shooter. She stated that she told detectives Appellant was not the shooter but did not want to name the shooter because she was scared.

On December 12, 2022, the Commonwealth filed a response. In part[,] the Commonwealth argued that this is an improper motion under Pa.R.Crim.P. 704, because this is an issue that should be raised by way of a post-sentence motion.

On April 19, 2023, a sentencing hearing was held. The Motion for Extraordinary Relief was denied [because] counsel presented no extraordinary circumstances under Rule 704. Appellant was sentenced to life imprisonment.

On April 28, 2023, Appellant filed a post-sentence motion which asserted a motion for judgment of acquittal and a motion for a new trial. The motion for a new trial was warranted, it was alleged, because the verdict was not supported by the weight of the evidence and based upon new[ly]-discovered evidence, namely Mr. Bundy's text message. The [p]ost-[s]entence [m]otion was denied on May 5, 2023.

*Id.* at 6-7 (cleaned up; record citations omitted).

Appellant filed a timely appeal to this Court, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

1. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL BASED ON AFTER-DISCOVERED EVIDENCE[?]

2. DID THE TRIAL COURT ERR IN RULING THAT COMMONWEALTH PROVIDED SUFFICIENT EVIDENCE FOR MURDER[?]

3. DID THE TRIAL COURT ERR IN THAT THE COURT'S FINDINGS WERE AGAINST THE WEIGHT OF THE EVIDENCE[?]

Appellant's Brief at 3 (paginated as page "v" in Appellant's brief).

In his first argument, Appellant contends that the court erred in denying him a new trial based on alleged after-discovered evidence, a text message that LaTrae Bundy sent to defense counsel one week after Appellant's guilty verdict. The text message stated:

> Hi Quinn! It's La Trae, I just wanted to reach out and apologize for not stepping up and telling you the honest truth regarding everything I know. As you could have seen my family has put this burden on me while being in the middle of this whole case. They know the real reason behind what happened to my brother Rasheed, and I know it's too late but the guy that was the 4th person name is Rashid Wallop, he knew my brothers.
>
> I have told detectives when all this first happened it wasn't [Appellant] it was somebody else and they asked for a name but I was scared because he is dangerous. I know me telling you this now doesn't do anything for you because the case is over but I want to say from the bottom of my heart I am sorry for not being honest. And thank you for trying your hardest with [Appellant]. I hope you have an amazing day and week, take care.

Appellant's Motion For Extraordinary Relief, 9/6/22, at ¶ 8.

To obtain a new trial on the basis of after-discovered evidence, the defendant must show that

> the evidence (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.

***Commonwealth v. Felder***, 247 A.3d 14, 17 (Pa. Super. 2021).

To be entitled to an evidentiary hearing on a post-sentence motion for a new trial based on after-discovered evidence, the motion "must, at the very least, describe the evidence that will be presented at the hearing." ***Commonwealth v. Castro***, 93 A.3d 818, 827 (Pa. 2014). "Simply relying on conclusory accusations made by another, without more, is insufficient to warrant a hearing." ***Id.*** An evidentiary hearing is for the presentation of evidence, not the potential discovery of evidence. ***Id.*** at 827-28. Thus, the motion must assert "actual discovery of actual evidence, not merely the possibility of such evidence." ***Id.*** at 828. The motion "is not to serve as a preemptive means of securing a hearing that will itself comprise the investigation. . . [an appellant] need[s] to clearly articulate in his motion what evidence he would present to meet the test." ***Id.*** Further, the evidence "must be producible and admissible." ***Id.*** at 827.

If the court does not grant a new trial, we review its decision for abuse of discretion. ***Felder***, 247 A.3d at 17-18. The court gave two reasons for denying Appellant's after-discovered evidence claim. First, it held that the proposed evidence was inadmissible hearsay:

> Although styled by counsel as "evidence" it is not actual evidence and Appellant was not entitled to a new trial or even a hearing on the basis of this text. This text is nothing more than inadmissible hearsay. At trial, Ms. Bundy testified that she was inside the house at 1236 Markley Street when her brother was murdered. (N.T., Bench Trial, V. III, 8/17/22, pp. 36-37). She did not see the murder happen. Therefore, her assertion that there was a

> fourth person in the alleyway and that that person was Rashid Wallop, did not result from her first-hand observation. This new "evidence" would have had to have been told to her by someone else, making this inadmissible hearsay.

Opinion at 10. Hearsay is defined as a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove truth of matter asserted in the statement. Pa.R.E. 801(c). Hearsay is inadmissible unless it falls within an exception provided by the Rules of Evidence, by statute, or by other rules prescribed by our Supreme Court. Pa.R.E. 802. The testimony cited by the court confirms that Bundy indeed was inside the house at 1236 Markley Street and did not witness the murder. Thus, the claim in her email is hearsay because it had to have been based upon a report from another individual and is offered for its truth. Appellant fails to demonstrate that Ms. Bundy's email falls within any exception to the hearsay rule. Therefore, the court correctly determined that her statement was inadmissible. **Castro**, 93 A.3d at 827 (after-discovered evidence must be admissible to permit relief).

The court also held that Bundy's statement did not warrant relief because it would only be used for impeachment purposes. Appellant argued in the penultimate paragraph of his post-sentence motion, "The text message and the belief that the family coerced her testimony and is aware of the 4th person in the breezeway seriously undermines the reliability of the only witness to the homicide." Post-Sentence Motion, 4/28/23, at 5 (unpaginated). Based on this assertion, the court deduced that the sole purpose of Bundy's

statement was to impeach Mr. Burke's testimony that the only individuals in the alleyway were Appellant and the victim. Opinion at 11. We find no abuse of discretion by the trial court in rejecting this issue.

"Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment." *Commonwealth v. Weis*, 611 A.2d 1218, 1229 (Pa. Super. 1992). We see no purpose for Appellant to introduce Bundy's statement other than to "contradict other evidence previously given by another witness," Burke. Thus, Bundy's statement fails *Felder's* requirement that after-discovered evidence "will not be used solely to impeach the credibility of a witness." *Id.*, 247 A.3d at 17. For these reasons, the trial court acted within its discretion by rejecting Appellant's request for a new trial based on after-discovered evidence.

In his second argument, Appellant contends that the evidence was insufficient to sustain his conviction for first-degree murder. We disagree. The standard we apply in reviewing the sufficiency of the evidence is

> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime

beyond a reasonable doubt by means of wholly circumstantial evidence.... Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Brockman***, 167 A.3d 29, 38 (Pa. Super. 2017).

The Crimes Code provides a "criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). A conviction for first-degree murder requires the trier of fact to find that "(1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill." ***Commonwealth v. Hitcho***, 123 A.3d 731, 746 (Pa. 2015). "The Commonwealth may prove the specific intent to kill necessary for first degree murder wholly through circumstantial evidence." ***Commonwealth v. Ovalles***, 144 A.3d 957, 969 (Pa. Super. 2016). Moreover, the factfinder "may properly infer malice and specific intent from the fact that a victim was shot multiple times." ***Commonwealth v. Kennedy***, 151 A.3d 1117, 1122 (Pa. Super. 2016). In addition, "the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." ***Commonwealth v. Smyser***, 195 A.3d 912, 915 (Pa. Super. 2018).

The Commonwealth adduced the following evidence during trial: Burke, who was present during the shooting, testified that Appellant was the shooter. On December 31, 2020, Burke was present at 1236 Markley Street spending time with his family, including his brother, the victim. Burke testified, and cell phone records confirm, that Appellant called Burke twice within a short time span asking to speak with the victim and asking that he come outside. After

the second call, Burke went outside with the victim and walked to the alleyway. Burke testified that he only saw Appellant in the alleyway. Believing that the victim and Appellant were only going to talk, he turned his back to the alleyway. Less than thirty seconds later, Burke heard gunshots mere feet away from the alleyway. Burke immediately went into the alleyway to check on the victim and saw Appellant run past him to his car down the street and flee the scene. He cried out repeatedly, "Ny shot my brother." N.T., 8/15/22, at 53-63.

Davis, the pizza deliveryman, testified that he saw four people, two on each side, in the alleyway while he was behind his car nearby 1242 Markley Street. He never got closer to the alleyway. Davis was only able to see figures and not faces, the people were quiet and he heard no arguing or conversation. He then heard two or three gunshots and saw someone run out of the alleyway, across the street past him, and into a car, which fled the scene. He also heard someone yell "he shot my brother" repeatedly and saw the speaker exit the alleyway. On redirect examination, Davis testified that the speaker said repeatedly, "Ny shot my brother." N.T., 8/16/22, at 69-88.

A surveillance video corroborated Burke's and Davis's testimony. The video showed the arrival of Appellant's vehicle one block away from the murder scene at 8:59 p.m., N.T., 8/15/22, at 111-12, two people exiting the vehicle, one of whom was carrying a large object, and both individuals walking towards the alleyway, *id.*, the arrival of Davis's vehicle at 9:39 p.m., *id.* at

113, and an individual fleeing from the alleyway at 9:41 p.m. and departing in the vehicle that was parked one block from the murder scene, *id.* at 114.

Ford, Appellant's friend, testified that Appellant confessed to murdering the victim because Appellant believed that the victim knew about Bundy's relationship with another man but did not share this information with Appellant. N.T., 8/16/22, at 90-100. The court found Ford's testimony credible. Opinion at 17.

Appellant insists that the evidence is insufficient because Burke testified that three people were in the alleyway (Appellant, Burke and the victim), whereas Davis testified that four people were in the alleyway. In our review of the sufficiency of the evidence, however, we must view the evidence in the light most favorable to the Commonwealth. This standard requires us to accept as true Burke's testimony that (1) only Appellant, Burke and the victim were in the alleyway, (2) Burke left the alleyway, (3) Burke heard gunshots, (4) Burke observed Appellant flee the alleyway and drive off in a car, and (5) Burke repeatedly said, "Ny shot my brother."

Furthermore, Davis's testimony is consistent with Burke's testimony except for the number of individuals in the alleyway. In particular, Davis, like Burke, heard gunshots and then saw an individual flee the alleyway and drive away from the scene. Finally, Appellant confessed to Ford that he murdered the victim, and video surveillance and cell phone evidence corroborated Burke's and Davis's testimony. Construed in the light most favorable to the

Commonwealth, this evidence is sufficient to sustain Appellant's murder conviction. **Brockman, supra.**

Appellant also argues that the evidence was insufficient because Burke did not actually see him fire any shots at the victim. We disagree. In **Commonwealth v. Randall**, 758 A.2d 669 (Pa. Super. 2000), this Court held that there was sufficient evidence to sustain the defendant's conviction for first-degree murder even though the witness did not actually see the defendant shoot the victim. The defendant in **Randall** was standing outside smoking marijuana with the victim and a witness. When the witness was smoking the marijuana cigarette, he heard three gunshots and saw the victim lying on the ground. He did not actually see the defendant pull the trigger or the death of the victim.

This Court stated that "[a]lthough [the witness] did not directly observe Appellant shoot the decedent, [the witness], the Appellant and the decedent were the only individuals present in the near vicinity at the time of the shooting." **Id.** at 675. The victim died of three gunshot wounds to the head. **Id.** This Court held that "[u]nder these circumstances, the jury could have reasonably inferred that it was Appellant who shot the decedent thereby causing his death." **Id.** This Court further held that "[a]ppellant's deliberate use of a pistol to deliver three bullets to the decedent's head, one of the most vital portions of the body, was ample evidence of his specific intent to kill [the victim]."

In further support of this determination, the **Randall** court cited **Commonwealth v. Rios**, 684 A.2d 1025, 1030 (Pa. 1996), in which our Supreme Court found sufficient evidence to sustain a first-degree murder conviction even though the witnesses did not actually see the defendant shoot the victim, where (1) a witness testified that defendant wielded handgun, (2) the defendant threatened to kill the victim and severely beat the victim while his hands and feet were bound, (3) the defendant was in the room shortly before the witness heard the shot that killed the victim, and (4) a firearms expert testified that markings on bullet recovered from the victim's body indicated that it could not have been fired from the victim's firearm that had been taken by the defendant's accomplice.

Here, as in **Randall** and **Rios**, although Burke did not actually see Appellant shoot the victim, the evidence recounted above—specifically, the testimony of Burke, Davis and Ford—provides ample circumstantial evidence that Appellant shot the victim. Furthermore, the evidence that Appellant shot the victim multiple times in vital portions of his body provides ample evidence of his malice and specific intent. The evidence further demonstrates that Appellant shot himself during the robbery because one of the bullets that he fired ricocheted in the narrow alleyway and lodged itself in his neck.

Appellant also claims that Bundy's email undercuts the sufficiency of the evidence. This claim fails because we evaluate sufficiency claims based on evidence admitted during trial. **Brockman**, 167 A.3d at 38. Bundy's email was not admitted into evidence during trial. Moreover, it was inadmissible

hearsay. Therefore, it does not affect our evaluation of the sufficiency of the evidence.

Finally, relying on **Commonwealth v. Mosteller**, 284 A.2d 786 (Pa. 1971), Appellant argues that the evidence was insufficient because, in his view, the reliability of Burke's testimony is open to serious question. Appellant's Brief at 14. In **Mosteller**, the defendant's fifteen-year-old daughter accused him of sexual assault. Following the complainant's accusations, she was removed from her parents' home and sent to live with her grandmother. She testified during trial that the defendant sexually assaulted her. A medical witness called by the Commonwealth testified, however, that the complainant's hymen was intact and uninjured, and that a vaginal cotton swab and rectal examination were negative. Thus, the Commonwealth's case rested entirely upon the complainant's testimony.

The jury found the defendant guilty. After trial, the complainant recanted her testimony, and the defendant moved for a new trial based on after-discovered evidence. The complainant testified during a post-trial hearing that her grandmother and her uncle pressured her into testifying against the defendant. She maintained her recantation despite being warned of criminal charges for perjury and a substantial prison term. In addition, her great-aunt testified that she had asked the complainant before trial whether the defendant had done anything to her, and the complainant replied in the negative. The trial court and this Court held that a new trial was not warranted, but our Supreme Court held that a new trial was necessary,

reasoning, "[W]here as here the defendant's conviction is based entirely on testimony of the child [witness] and the truth of that testimony is open to serious question because of the testimony of a disinterested medical witness, a subsequent recantation of testimony as supported by this record necessitates a new trial." *Id.* at 789. The Court observed:

> [N]ot only is there nothing to contradict [the complainant's] recantation, [but] there is evidence from her great aunt that [the complainant] had fabricated her story. Additionally, [the complainant] persisted in her recantation despite having been informed that she was subject to criminal charges for perjury and a substantial prison term. This was a clear declaration against interest entitled to considerable credibility, unlike the normal retraction by a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner.

*Id.*

*Mosteller* does not help Appellant's cause for multiple reasons. To begin, *Mosteller* held that Appellant was entitled to a new trial due to after-acquired evidence. *Mosteller* does not address, let alone support, the remedy Appellant seeks in his present argument, an arrest of judgment due to insufficiency of the evidence. Second, Appellant claims that Burke's testimony in the present case was equally as unreliable as the complainant's testimony in *Mosteller*. This attack on Burke's testimony is completely unavailing. As we said above, in this challenge to the insufficiency of the evidence, we are required to construe Burke's testimony and all other evidence in the light most favorable to the Commonwealth. Construed in this manner, we accept Burke's testimony and the other evidence as true, and we

reject Appellant's invitation to deem it unreliable.[1]  Other distinctions between Burke's testimony and the complainant's testimony in ***Mosteller*** deserve mention as well.  Unlike the complainant in ***Mosteller***, Burke did not recant his testimony.  As well, the complainant's testimony in ***Mosteller*** was the only evidence against the defendant, but here, there were two other important witnesses besides Burke—Davis and Ford—as well as video and cell phone evidence.  Appellant does not dispute the reliability of Davis's or Ford's testimony, the video evidence, or the cell phone evidence, all of which provides important details that complete the web of circumstantial evidence against Appellant.  For these reasons, Appellant's challenge to the sufficiency of the evidence fails.

In his third and final argument, Appellant contends that he is entitled to a new trial because the verdict was against the manifest weight of the evidence.  Our Supreme Court has instructed:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court.  ***Commonwealth v. Widmer***, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); ***Commonwealth v. Brown***, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994).  A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion.  ***Widmer***, 560 Pa. at 319–20, 744 A.2d at 752.  Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all

---

[1] We note that the trial court also rejected Appellant's attack on Burke's credibility.  ***See*** Opinion at 20 ("Burke was a credible witness").

the facts is to deny justice.'" ***Id.*** at 320, 744 A.2d at 752 (citation omitted).

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013). "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." ***Widmer***, 744 A.2d at 751. "[A]n appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." ***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003).

Appellant claims that the Commonwealth's "only witness," Burke, was not credible. As discussed above, Burke was not the only witness against Appellant, and the trial court found Burke's testimony credible, a ruling well within the court's discretion. Appellant also claims that Bundy's affidavit entitles him to a new trial, but we held above that Bundy's affidavit does not entitle Appellant to relief. Next, Appellant argues, "No firearm was found or retrieved from [Appellant]. Moreover, [Appellant] was also shot from behind yet the Commonwealth presents some tale to suggest he shot a firearm and it ricocheted off of something and hit him in the back of his neck without any scientific certain[t]y despite testimony." Appellant's Brief at 18.

The trial court did not address these issues in its opinion because Appellant did not raise them in his Pa.R.A.P. 1925 statement of matters complained of on appeal. The closest that Appellant came to making these

claims in his Rule 1925 statement was his statement that "Burke's testimony was insufficient to show that [Appellant] was the actual shooter." Pa.R.A.P. 1925 Statement, 6/13/23, at ¶ 3(b). Arguably, therefore, these claims are waived. *See*, *e.g.*, *Commonwealth v. Elia*, 83 A.3d 254, 262-63 (Pa. Super. 2013) (defendant's claim that trial court erred in granting his motion to withdraw guilty plea waived argument that trial court abused its discretion by conducting plea withdrawal hearing while defendant was being represented by counsel under an alleged conflict of interest, where defendant failed to raise such issue in his statement of matters complained of on appeal).

Even if they were preserved for appeal, they do not entitle Appellant to relief. Though no firearm was recovered, ample evidence proved that Appellant was the perpetrator, including the testimony of multiple witnesses, the video surveillance evidence and cell phone records. Regarding the detail that a bullet struck Appellant in the neck, Dr. Wardak's testimony established that this bullet ricocheted off the pavement before striking Appellant. This testimony suggests that Appellant fired the bullet, and that the bullet ricocheted off the pavement and lodged itself in his neck. Nothing in the record contradicts this scenario, and in any event, other evidence points squarely at Appellant as the murderer.

For these reasons, the trial court acted within its discretion by denying Appellant's motion for new trial. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2024